**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| MUJAE GROUP, INC., d/b/a VOXTONEPRO, | |
| Plaintiff, | C.A. No. _____ |
| vs. | **JURY TRIAL DEMANDED** |
| SPOTIFY USA INC., SPOTIFY LTD, SPOTIFY AB, and SPOTIFY TECHNOLOGY S.A., | |
| Defendants. | |

**COMPLAINT FOR THEFT OF TRADE SECRETS,
MISAPPROPRIATION, AND UNFAIR COMPETITION**

Plaintiff Mujae Group, Inc., d/b/a VoxTonePRO ("VoxTonePRO"), by and through its undersigned counsel, files this Complaint against Spotify USA Inc., Spotify Ltd, Spotify AB, and Spotify Technology S.A. (collectively, "Spotify").  In support thereof, VoxTonePRO states as follows:

**NATURE OF THE ACTION**

1.      This is a case about a big business stealing from a small business.  Before it had meetings with VoxTonePRO, Spotify had no system for self-service voiceover ad creation.  But after several meetings with VoxTonePRO—during which it learned details of VoxTonePRO's platform and led VoxTonePRO to believe that a partnership was coming—Spotify scrambled to launch a platform just like VoxTonePRO's.  Having gotten what it wanted from VoxTonePRO, Spotify brushed VoxTonePRO aside.  These facts give rise to claims for trade secret misappropriation arising under the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq.*, and for

trade secret misappropriation and related claims under New York state trade secret, misappropriation, and unfair competition laws.

2. This action relates to Spotify's theft by improper means of VoxTonePRO's confidential, proprietary, and trade secret information relating to its proprietary audio ad creation technology—a scalable, cost-efficient, self-service online application that generates audio ads with voiceover narrations, music and/or sound effects. As set forth below, VoxTonePRO has been significantly and irreparably injured as a result of Spotify's conduct.

3. All allegations herein directed to information not in VoxTonePRO's possession, custody, or control are made on information and belief.

## PARTIES

4. Plaintiff Mujae Group, Inc., d/b/a VoxTonePRO, is a Canadian corporation with its principal place of business at 3300 Bloor Street West, Suite 3140, Toronto, Ontario.

5. On information and belief, Defendant Spotify USA Inc. is a Delaware corporation with its principal place of business at 4 World Trade Center, 150 Greenwich Street, 62nd Floor, New York, NY 10007. On information and belief, Spotify USA Inc. is a wholly owned subsidiary of Spotify AB.

6. On information and belief, Defendant Spotify Ltd is a company organized under the laws of England and Wales, having its principal place of business at 4th Floor, 25 Argyll Street, London W1F 7TU, United Kingdom. On information and belief, Spotify Ltd is a wholly owned subsidiary of Spotify Technology S.A.

7. On information and belief, Defendant Spotify AB is a Swedish company, having its principal place of business at Birger Jarlsgatan 61, 4tr 113 56 Stockholm, Sweden. On information and belief, Spotify AB is a wholly owned subsidiary of Spotify Technology S.A.

8.     On information and belief, Defendant Spotify Technology S.A. is a company organized under the laws of the Grand Duchy of Luxembourg, having its principal place of business at 42-44, Avenue de la Gare, L-1610 Luxembourg, Grand Duchy of Luxembourg.

## JURISDICTION & VENUE

9.     This Court has jurisdiction over this case under 28 U.S.C. §§1331 & 1367, because VoxTonePRO's claims arise under, inter alia, the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq*.  This Court has supplemental jurisdiction over VoxTonePRO's state law claims under 28 U.S.C. § 1367 because they are so related to claims in the action within the Court's original jurisdiction such that they form part of the same case or controversy.

10.     Venue is appropriate under 28 U.S.C. §1391(b).  On information and belief, Spotify USA Inc. is a Delaware corporation and the remaining defendants are not resident in the United States within the meaning of 28 U.S.C. §1391(c)(3).

11.     On information and belief, Defendants are subject to the Court's personal jurisdiction due, at least, to Spotify USA Inc.'s incorporation in the state, Spotify AB's operation of the US Spotify website, as well as Spotify Ltd, Spotify AB, and Spotify S.A.'s substantial business in the district, directly, or through intermediaries, including Spotify USA Inc.

## VOXTONEPRO'S CONFIDENTIAL, PROPRIETARY AND TRADE SECRET AUDIO AD CREATION TECHNOLOGY

12.     Audio ads are a valuable way of reaching consumers, particularly as podcasts and other free streaming audio services gain popularity.  In 2018, total digital audio ad revenue in the United States grew to $2.3 billion, increasing by approximately 23% since 2017.

13.     Historically, creating audio ads was an expensive and time-consuming process involving voiceover artists, recording studios, and professional sound mixers.  Voiceover artists were each individually retained, and the payment structure and allocation of rights would vary

based on the parties' contractual negotiations.  The studio space required to record the voiceover artists was also expensive.  And an advertiser needed to work with a professional sound mixer to produce a professional-grade result.  This long and cumbersome process meant that producing an ad often cost several thousand dollars and took weeks or months to complete.

14.     Due to the cost of creating audio ads, media companies like Spotify would require advertisers to commit at least $25,000 per ad campaign.

15.     In the early 2000s, VoxTonePRO's founder, Mr. Nadeem Mughal, began developing a first-of-its-kind technology: a scalable, cost-efficient, self-service online application that utilizes proprietary technology and know-how to generate audio ads with voiceover narrations, music and/or sound effects.

16.     After years in the making, VoxTonePRO achieved its goal: generating high-quality audio ads within 48 hours, with predetermined prices of as little as $13.99 per ad.  VoxTonePRO was able to do this by saving time and money at each step of the ad-making process, including, for example:

- Customers order audio ads without having to interact with project managers;

- Customers choose music or sound effects without having to negotiate royalties;

- Customers choose voice artists without having to negotiate prices or contract terms—indeed, customers specify how they would like their ads to sound (including the narrator's accent and emotion) without any interaction with the voice artist;

- VoxTonePRO's proprietary business practices ensures that voice artists produce high-quality narrations at very low marginal cost; and

4

- VoxTonePRO's proprietary information technology enables it to generate finished audio ads including voice narrations, music and/or sound effects with minimal additional overhead.

17. By introducing automation and/or standardization processes at each step of the way, VoxTonePRO drove down the price of audio ads and created a revolutionary platform that can be adopted on a massive scale. VoxTonePRO began offering its audio ad services to the public in 2006.

18. On information and belief, when first disclosed to Spotify, VoxTonePRO's model was unique in the field of audio ads. Using conventional recording studios, or even other online voice actor services, a 15-word ad could cost hundreds or thousands of dollars. VoxTonePRO, however, offers a 200-character (approximately 50-word) audio ad for $13.99. Additionally, a two-studio company could not scale up for purposes of servicing a global platform like Spotify—the studios would quickly hit capacity. The VoxTonePRO platform, however, can accommodate near limitless growth. Indeed, VoxTonePRO was designed for large-scale enterprises: it provides an efficient, scalable model for making thousands of standardized products, much like a factory for audio ads. While some competitors had moved away from the brick-and-mortar recording studio business model, no other business had conceived of or developed anything like VoxTonePRO's proprietary business practices and order-processing technologies to offer an equivalent scalable, cost-efficient, self-service online application that generates audio ads with voiceover narrations, music and/or sound effects.

19. Over its many years of effort and expense, VoxTonePRO has developed, accumulated, maintained, and refined confidential and proprietary know-how, including business practices, innovative order-processing technologies, and methods for implementing such practices

and technologies using training manuals, protocols, applications, techniques, processes, procedures, programs, and codes.  As described above, this know-how allows VoxTonePRO to offer an improvement to the traditional audio ad business model.  By applying its proprietary business practices and order-processing technologies, VoxTonePRO reduced costs to the consumer, and introduced a unique platform that could be adopted on a global scale. VoxTonePRO's trade secrets were developed over the course of many years through repeated prototyping and testing of various designs and algorithms.  The result is that VoxTonePRO created the only service of its kind in the world.

20.     VoxTonePRO has spent and continues to spend significant amounts of time and money in developing, improving, and protecting its confidential, proprietary, and trade secret business practices and order-processing technologies, as well as training manuals and other related materials.  Rivals could develop analogous methods, if at all, only through the substantial investment of time and resources.

21.     Because VoxTonePRO's trade secrets are so commercially valuable, VoxTonePRO has taken reasonable and careful measures to maintain them.  For example, VoxTonePRO stores the computerized components of its proprietary system on a private website that can be accessed only with appropriate login credentials.  VoxTonePRO carefully guards access to this website, extending login credentials only to those who agree not to misuse or share VoxTonePRO's proprietary methods.  In addition, VoxTonePRO incorporates nondisclosure agreements into its contracts with voiceover artists.  Those agreements define "Confidential Information" to include any "trade secret or confidential or proprietary information in the possession or control of VoxTonePRO."  The agreements also require voiceover artists to "keep in strictest confidence and trust all Confidential Information at all times."

22.     Indeed, any such unauthorized disclosure would provide a competitor with an unfair competitive advantage based on its "free riding" on VoxTonePRO's research and development.  It would allow that competitor to gain the benefit of VoxTonePRO's valuable insight and confidential information without having to conduct any of the extensive and expensive research and development that VoxTonePRO undertook to create those innovations.  Any such competitor could therefore compete against VoxTonePRO using VoxTonePRO's own platform while offering the same or substantially the same services as those offered by VoxTonePRO.

23.     Thus, VoxTonePRO's trade secrets have independent economic value derived from the fact that they are not generally known nor readily ascertainable within the industry through lawful means.  And VoxTonePRO has made reasonable efforts to ensure the secrecy of its trade secrets, which merit legal protection from unauthorized disclosure, misappropriation, dissemination, and/or use.

## VOXTONEPRO'S PARTNERSHIP WITH SPOTIFY

24.     In January 2015, on information and belief, VoxTonePRO was the only company offering a scalable, cost-efficient, self-service online platform for creating audio ads with voiceovers, music, and/or sound effects.

### VoxTonePRO Sought a Partner to Fulfill VoxTonePRO's Unique Potential

25.     VoxTonePRO searched for business partners who had the scale to maximize the profits VoxTonePRO's platform could realize.  VoxTonePRO considered partnering with Facebook and Spotify, and reached out to both.  Given the commitments involved in a serious partnership negotiation (which may include creating new software applications), VoxTonePRO chose to focus its resources on Spotify.  At that time, Spotify's ad-supported audio service already reached across the globe and generated hundreds of millions of dollars per year.  But Spotify

required advertisers to make a minimum investment of $25,000 per campaign and its ads took extensive time to produce.

26.     In January 2015, VoxTonePRO offered to form a partnership with Spotify.  In this partnership, Spotify, as the reseller of VoxTonePRO's service, would offer Spotify users VoxTonePRO's ad creation service through the Spotify website.  In the Parties' early discussions, Mr. Mughal explained VoxTonePRO's unique position in the field of self-service audio ads.  A Spotify executive expressed interest in VoxTonePRO's platform and in finding out the "best way" to "programmatically create ads."  Mr. Mughal provided a demonstration of VoxTonePRO's public-facing website to show how customers place orders.  Mr. Mughal also showed how resellers—like Spotify—could access VoxTonePRO's reseller portal.  The discussion did not bear fruit.

### Spotify Saw VoxTonePRO as an Opportunity to Bypass Hard Work

27.     On information and belief, Spotify began plotting to steal VoxTonePRO's trade secrets in 2016, when Spotify reached out to VoxTonePRO on its own initiative.  In August 2016—17 months after VoxTonePRO shared with Spotify the idea of a "self-serve" ad platform—Spotify hired Derek Kuhl to develop a "self-serve" ad platform for Spotify.  By this time, Spotify was a global enterprise and needed a self-service ad platform that could operate on a global scale—just like VoxTonePRO.

28.     Mr. Kuhl quickly learned about VoxTonePRO and Mr. Mughal's 2015 demonstrations to Spotify.  Mr. Kuhl wanted to bypass the hard work of creating a scalable, self-service ad platform—by stealing what VoxTonePRO had already done.

29.     Over the next several months, Spotify dangled partnership prospects in front of VoxTonePRO in emails, phone calls, and at least one in-person meeting.  Lulled into a false sense of trust and confidentiality, VoxTonePRO revealed its trade secrets to Spotify.

**Spotify Induced VoxTonePRO to Reveal Its Trade Secrets at a 2016 Meeting**

30.     On November 2, 2016, Mr. Kuhl reached out to Mr. Mughal.  Mr. Kuhl said he was "now leading the buildout of our self-service ads platform," and he would "love to re-connect on potential ideas for working together."  They met two days later at Spotify's New York City headquarters.  During that meeting, Mr. Kuhl assured Mr. Mughal that any information shared by VoxTonePRO would be treated as confidential and used only for the development of a business partnership between Spotify and VoxTonePRO.

31.     Based on those assurances, Mr. Mughal gave Mr. Kuhl an extensive presentation about VoxTonePRO's platform and shared VoxTonePRO's trade secrets at the November 4, 2016 meeting.  In that meeting, Mr. Mughal explained in detail VoxTonePRO's confidential business practices for a scalable, low-cost, ad platform.  Mr. Mughal also described VoxTonePRO's proprietary training protocol in detail.  Mr. Kuhl took notes throughout Mr. Mughal's presentation.  Mr. Mughal also demonstrated the back-end applications of VoxTonePRO's website, which revealed VoxTonePRO's innovative order-processing technologies.  Mr. Kuhl took extensive notes during Mr. Mughal's demonstrations of VoxTonePRO's back-end applications.  In addition, Mr. Mughal explained to Mr. Kuhl how VoxTonePRO's platform could be scaled to meet Spotify's growing ad demands and how Spotify could integrate the platform with its current "ad ecosystem."

32.     During the meeting, Mr. Kuhl asked questions about integrating VoxTonePRO into Spotify's existing services.  Mr. Kuhl and Mr. Mughal also discussed how VoxTonePRO

automated certain aspects of the ad production process. And Mr. Mughal provided Mr. Kuhl information regarding the sampling rate of audio ads, as well as the programming language used by the VoxTonePRO website and database.

33.     During the meeting, Mr. Kuhl and Mr. Mughal also discussed financial terms of the partnership, including revenue share, licensing fees, or pre-paid fee structure. Mr. Kuhl asked Mr. Mughal to send over VoxTonePRO's financial terms so the "business folks" at Spotify can focus on the financial terms, while Mr. Mughal and Mr. Kuhl focus on finishing the integration work and launching the ad platform together. Mr. Mughal sent Mr. Kuhl VoxTonePRO's financial terms a week later.

34.     Mr. Kuhl recognized the potential of VoxTonePRO's platform. He expressed enthusiasm about working with VoxTonePRO, and even suggested that Mr. Mughal consider relocating his family from Toronto to New York City so that the two could work together more closely.

### Spotify Gained Access to Secrets from VoxTonePRO's Restricted Website

35.     Dangling the prospect of a partnership with Spotify, Mr. Kuhl asked Mr. Mughal for access to VoxTonePRO's restricted, back-end website for its proprietary platform. Because Mr. Kuhl had assured Mr. Mughal that Spotify would treat VoxTonePRO's information confidentially and work with VoxTonePRO as a business partner, Mughal gave Mr. Kuhl the access he requested.

36.     On November 10, 2016, Mr. Mughal set up a password-protected account that gave Mr. Kuhl access to VoxTonePRO's platform. Mr. Mughal also personally walked Mr. Kuhl and other Spotify employees on Mr. Kuhl's team through virtually the entire system built by VoxTonePRO, including various password-protected "portals."

37.    By giving Mr. Kuhl and his team access to this account and a personal tour of the platform, Mr. Mughal gave Mr. Kuhl and his team the ability to see how the platform worked from the inside.  Upon information and belief, Mr. Kuhl and/or members of his team improperly used the account to obtain VoxTonePRO's confidential and proprietary information about its platform, including its trade secrets.

### Spotify Induced VoxTonePRO Into Revealing More Secrets to More Employees

38.    Still lacking the expertise to independently recreate VoxTonePRO's platform, Spotify arranged additional meetings between Mr. Mughal and other Spotify employees with different technical expertise.  In particular, in early 2017, Mr. Kuhl put Mr. Mughal in touch with two additional employees, Stacey Wallace and Alex Von Reyn.  He identified Ms. Wallace as "the product owner for the new ad platform we're building."  Mr. Von Reyn was introduced as handling "our 3rd party creative partnerships."  Mr. Kuhl claimed that Ms. Wallace and Mr. Von Reyn were ready to "move the conversation forward."

39.    In March 2017, Mr. Mughal had a Google Hangout meeting with Ms. Wallace and Mr. Von Reyn.  In advance of the Hangout meeting, Mr. Mughal sent login credentials to Mr. Von Rehn and Ms. Wallace, allowing them to access VoxTonePRO's platform in its entirety.  Mr. Mughal did so in continued reliance on Mr. Kuhl's representations that Spotify would treat any information he shared confidentially and use it only to work in partnership with VoxTonePRO.

40.    The Hangout meeting between Mr. Mughal, Ms. Wallace, and Mr. Von Reyn lasted for hours and involved detailed technical discussions of how Spotify's platform could incorporate VoxTonePRO's system to produce finished ads in a short time period.  These discussions included the details about VoxTonePRO's proprietary order-processing algorithm.

41.     Based on the questions Mr. Von Rehn and Ms. Wallace were asking Mr. Mughal, it was clear that Spotify had not yet been able to build its own programmatic ad creation platform. The level of detail, and the focus on integrating VoxTonePRO's system into Spotify's platform, reinforced to VoxTonePRO that Spotify was dedicated to the partnership and that the companies would soon be launching the ad studio on Spotify's platform.

## SPOTIFY'S THEFT OF VOXTONEPRO'S CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

42.     In May 2017, after having learned the details of VoxTonePRO's confidential business processes and technical methods, Spotify abruptly informed Mr. Mughal that it would not be pursuing a partnership.  Specifically, on May 11, 2017, in response to a follow-up inquiry by Mr. Mughal, Mr. Von Rehn stated that Spotify was "full speed ahead building out other aspects of the platform and don't have the bandwidth to onboard new partners."  That claim was false.  On information and belief, Spotify continued to use the login credentials Mr. Mughal had provided to access VoxTonePRO's restricted website, and used the confidential information previously provided by Mr. Mughal to develop and implement its own competing audio ad creation service.

43.     Just four months later, in September 2017, Spotify launched the Spotify Ad Studio. Spotify Ad Studio allows advertisers to create audio ads and launch ad campaigns.  By paying a minimum of $250 for an ad campaign, advertisers can use the "Self-Service Audio Ad Creation Tool."

44.     The "Self-Serve Audio Ad Creation Tool" is essentially identical to the VoxTonePRO ad creation system: customers order ads by entering their desired text, selecting from a range of voice profiles, choosing from preset background music or other sound effects, and leaving a message for the voiceover artist.

45.     Spotify falsely described the Spotify Ad Studio as "truly the first self-service ad platform that lets [small and medium businesses] easily create an audio ad in minutes." That claim ignored that VoxTonePRO's system was the first such self-service ad platform and that Spotify had simply recreated VoxTonePRO's platform by stealing its trade secrets.

46.     Upon information and belief, because Spotify needed a solution for a high-volume audio ad creation service, it took VoxTonePRO's trade secret information to build Ad Studio's back-end audio ad creation system. Spotify needed a scalable, cost-efficient, self-service online application that generates audio ads with voiceover narrations, music and/or sound effects, and VoxTonePRO provided the solution. Spotify's Ad Studio can operate at scale, and does so using VoxTonePRO's trade secret business practices and order-processing technologies. And the Spotify Ad Studio was launched just months after the development team received multiple guided tours of VoxTonePRO's revolutionary system.

47.     Mr. Mughal's demonstration of, and instruction on, VoxTonePRO's capabilities allowed Spotify to enable individual customers to create ads on a scale that Spotify could not otherwise have accomplished. This is underscored in the drastic change in fees required by Spotify: the Spotify Ad Studio permits consumers to advertise on Spotify for just $250, ***one percent*** of the minimum amount Spotify had previously required.

48.     At no time did VoxTonePRO consent to Spotify using its trade secrets or benefiting from its creative ideas and hard work without compensation.

49.     By virtue of the Parties' mutual understanding and their conduct, as well as express promises by Spotify personnel, Spotify had a duty, and agreement with VoxTonePRO that all information, know-how, and technical guidance provided by VoxTonePRO to Spotify was to be maintained in confidence, and not be used without permission for any purpose other than doing

business with VoxTonePRO.  Spotify knew and had reason to know that they were required to maintain in confidence the information provided by VoxTonePRO, and that VoxTonePRO was inferring reasonably that Spotify consented and would do so.  Yet, Spotify breached VoxTonePRO's confidence, misappropriated VoxTonePRO's trade secrets, and repackaged them as its own.

## SPOTIFY HAS GREATLY PROFITED FROM ITS THEFT OF VOXTONEPRO'S CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

50.     VoxTonePRO's trade secrets have produced incredible profits for Spotify.  Spotify has proclaimed that "Ad Studio is going to allow us to open up a whole raft of new, potentially smaller advertisers, who will be able to log in individually and build their own campaigns."

51.     Spotify's ability to market to new customers has increased the profitability of its ad-supported services, while simultaneously reducing the associated costs.  In 2018, the first year after release of the Spotify Ad Studio, Spotify's worldwide profit from its ad-supported business increased from €416 million to €542 million, or 30%.  And during that period, the cost of ad-supported revenue decreased from 90% of the revenue to 82%.

52.     At the end of 2018, 25% of Spotify's ad sales revenue came from its programmatic and self-service platform, which had "become an increasingly significant portion of our Ad-Supported revenue, and for operating margins to expand as a result."

53.     In July 2019, Spotify proclaimed to investors that "Programmatic and Ad Studio revenue growth accelerated to 71% in Q2, and now account for approximately 30% of total Ad-Supported revenue."

54.     Spotify's own estimates thus indicate that it has derived hundreds of millions of dollars from the proprietary system it stole from VoxTonePRO.  Spotify has never shared any of

those profits with VoxTonePRO, even though it could not have obtained them without VoxTonePRO's trade secrets.

## FIRST CLAIM FOR RELIEF
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

55.     The allegations in paragraphs 12 through 54 are incorporated as though fully set forth herein.

56.     By committing the actions set forth herein, Spotify has misappropriated and continues to misappropriate VoxTonePRO's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

57.     VoxTonePRO owns and possesses confidential, proprietary, and trade secret information relating to its business practices and order-processing technologies, as well as its methods for implementing the same using its confidential, proprietary, and trade secret engineered solutions, which include protocols, applications, techniques, processes, procedures, programs, and codes.

58.     VoxTonePRO's trade secrets relate to a product or service used in, or intended for use in, interstate commerce, as they are used in connection with VoxTonePRO's products and services, which are offered and used across the country.

59.     VoxTonePRO expended substantial effort and capital in developing, maintaining, and possessing its trade secrets that it incorporated into its revolutionary process for creating audio ads.

60.     VoxTonePRO has taken reasonable measures to maintain the secrecy of its trade secrets, including by limiting access to them, and by requiring confidentiality agreements from VoxTonePRO's personnel and voice artists that prohibit, among other things, unauthorized access and disclosure of VoxTonePRO's trade secrets.  VoxTonePRO's trade secrets cannot be properly

acquired or duplicated because of the limited number of individuals who can access them, and because they are maintained entirely by VoxTonePRO personnel and voice artists who are contractually obligated to maintain the secrecy of VoxTonePRO's trade secrets.

61.     VoxTonePRO's trade secrets derive substantial economic value from not being generally known, and not being readily ascertainable through proper means by others because such information is extremely valuable to VoxTonePRO, critical to the operation of VoxTonePRO's business, and, if available to others, would enable them to compete with VoxTonePRO to VoxTonePRO's detriment.

62.     Spotify acquired VoxTonePRO's trade secrets by improper means starting no later than November 4, 2016, when Mr. Mughal disclosed VoxTonePRO's trade secrets with the expectation of secrecy.  Spotify further acquired VoxTonePRO's trade secrets by accessing VoxTonePRO's restricted website in 2016 and 2017, and by seeking additional details from Mr. Mughal during his Google Hangouts meeting with Mr. Von Reyn and Ms. Wallace.  In such instances, Spotify knew or should have known that the trade secret was acquired by improper means.

63.     Separate and apart from the improper acquisition of VoxTonePRO's trade secrets, Spotify has improperly disclosed and used, and continue to disclose and use, VoxTonePRO's trade secrets for the Spotify Ad Studio platform, launched in 2017, without VoxTonePRO's express or implied consent.  In such instances, Spotify knew or should have known that VoxTonePRO's trade secrets were acquired by improper means or under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

64.     Spotify's improper acquisition, use, and disclosure of VoxTonePRO's trade secrets occurred after May 11, 2016.

16

65.     Spotify's conduct constitutes knowing, willful, and malicious misappropriation.

66.     As a direct and proximate result of Spotify's wrongful conduct, VoxTonePRO has been substantially and irreparably harmed in an amount not readily capable of determination and for which there is no adequate remedy at law.  Unless restrained by this Court, Spotify will cause further irreparable injury to VoxTonePRO. This Court should grant VoxTonePRO injunctive relief, enjoining Spotify, Spotify's agents and employees, and all persons acting in concert or participation with Spotify, from engaging in any further use of VoxTonePRO's trade secrets and proprietary and confidential information.

67.     As a result of Spotify's actions, VoxTonePRO has suffered direct and consequential damages and is entitled to recover compensatory damages, including opportunity costs and exemplary damages in an amount to be proven at trial.

68.     Spotify has been unjustly enriched as a result of their misappropriation of VoxTonePRO's trade secrets.  VoxTonePRO therefore seeks recovery for this unjust enrichment, at least through disgorgement of Spotify's ill-gotten profits.

69.     To the extent VoxTonePRO's actual damages and Spotify's unjust enrichment are not reasonably ascertainable or subject to proof, VoxTonePRO is entitled to a reasonable royalty for the use of such trade secrets.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under New York Law)

70.     The allegations in paragraphs 12 through 69 are incorporated as though fully set forth herein.

71.     By committing the actions as set forth herein, Spotify has misappropriated and continues to misappropriate VoxTonePRO's trade secrets in violation of New York common law.

72.     VoxTonePRO owns and possesses confidential, proprietary, and trade secret information relating to its business practices and order-processing technologies, as well as its methods for implementing the same using its confidential, proprietary, and trade secret engineered solutions, which include protocols, applications, techniques, processes, procedures, programs, and codes.

73.     VoxTonePRO expended substantial effort and capital in developing, maintaining, and possessing its trade secrets that it incorporated into its revolutionary process for creating audio ads.

74.     VoxTonePRO has taken reasonable measures to maintain the secrecy of its trade secrets, including by limiting access to them, and by requiring confidentiality agreements from VoxTonePRO's personnel and voice artists that prohibit, among other things, unauthorized access and disclosure of VoxTonePRO's trade secrets.  VoxTonePRO's trade secrets cannot be properly acquired or duplicated because of the limited number of individuals who can access them, and because they are maintained entirely by VoxTonePRO personnel and voice artists who are contractually obligated to maintain the secrecy of VoxTonePRO's trade secrets.

75.     Spotify acquired VoxTonePRO's trade secrets by improper means starting no later than November 4, 2016, when Mr. Mughal disclosed VoxTonePRO's trade secrets with the expectation of secrecy.  Spotify further acquired VoxTonePRO's trade secrets by accessing VoxTonePRO's restricted website in 2016 and 2017, and by seeking additional details from Mr. Mughal during his Google Hangouts meeting with Mr. Von Reyn and Ms. Wallace.  In such

instances, Spotify knew or should have known that the trade secret was acquired by improper means.

76.     Separate and apart from the improper acquisition of VoxTonePRO's trade secrets, Spotify has improperly disclosed and used, and continue to disclose and use, VoxTonePRO's trade secrets for the Spotify Ad Studio platform, which launched in 2017, without VoxTonePRO's express or implied consent.   In such instances, Spotify knew or should have known that VoxTonePRO's trade secrets were acquired by improper means or under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

77.     As a direct and proximate result of Spotify's wrongful conduct, VoxTonePRO has been substantially and irreparably harmed in an amount not readily capable of determination and for which there is no adequate remedy at law.  Unless restrained by this Court, Spotify will cause further irreparable injury to VoxTonePRO. VoxTonePRO is entitled to injunctive relief enjoining Spotify, Spotify's agents and employees, and all persons acting in concert or participation with Spotify, from engaging in any further use of VoxTonePRO's trade secret and proprietary and confidential information.

78.     As a result of Spotify's actions, VoxTonePRO has suffered direct and consequential damages and is entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Misappropriation of Ideas Under New York Law)**

79.     The allegations in paragraphs 12 through 78 are incorporated as though fully set forth herein.

80.     VoxTonePRO and Spotify had a legal relationship in the form of an express contract, implied contract, or quasi contract.

81.     VoxTonePRO disclosed novel and concrete ideas to Spotify in reliance on this legal relationship.

82.     Spotify misappropriated VoxTonePRO's ideas.

83.     Spotify's misappropriation of VoxTonePRO's ideas has caused and will continue to cause substantial injury to VoxTonePRO.

84.     Spotify has acted willfully and maliciously.

### FOURTH CLAIM FOR RELIEF
#### (Unfair Competition Under New York Law)

85.     The allegations in paragraphs 12 through 84 are incorporated as though fully set forth herein.

86.     VoxTonePRO derived a commercial advantage from the trade secrets it developed.

87.     Spotify exploited VoxTonePRO's proprietary trade secrets to compete against VoxTonePRO using the same trade secrets, thereby usurping its commercial advantages in bad faith.

88.     Spotify's bad faith exploitation of VoxTonePRO's trade secrets has caused and will continue to cause substantial injury to VoxTonePRO.

89.     Spotify has acted willfully and maliciously.

### FIFTH CLAIM FOR RELIEF
#### (Misappropriation of Skills and Expenditures Under New York Law)

90.     The allegations in paragraphs 1 through 89 are incorporated as though fully set forth herein.

91.     VoxTonePRO invested labor, skill, and other expenditures in developing its proprietary system for creating audio ads.

92.     Spotify unethically misappropriated the fruits of VoxTonePRO's labor, skill, and other expenditures, unfairly neutralizing the commercial advantage VoxTonePRO rightly enjoyed.

93.     Spotify did so in bad faith, acting willfully and maliciously.

94.     Spotify's misappropriation of the fruits of VoxTonePRO's labor, skill, and other expenditures has caused and will continue to cause substantial injury to VoxTonePRO.

### SIXTH CLAIM FOR RELIEF
**(Unjust Enrichment Under New York Law)**

95.     The allegations in paragraphs 1 through 94 are incorporated as though fully set forth herein.

96.     VoxTonePRO and Spotify entered into a close relationship when Spotify represented that it would partner with VoxTonePRO on a platform for developing audio ads.

97.     Spotify has been enriched by receiving detailed information about VoxTonePRO's proprietary system that that allowed Spotify to develop a rival platform.

98.     Spotify's enrichment came at VoxTonePRO's expense without compensating VoxTonePRO.

99.     It is against equity and good conscience to permit Spotify to retain what VoxTonePRO now seeks to recover.

### PRAYER FOR RELIEF

WHEREFORE, VoxTonePRO prays for the following relief:

(a)     That Spotify and its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in concert with any of them be preliminarily and permanently enjoined from directly or indirectly misappropriating and continuing to utilize VoxTonePRO's trade secrets;

(b)     That VoxTonePRO be awarded damages for actual loss caused by the misappropriation of its trade secrets and damages for unjust enrichment caused by the misappropriation of VoxTonePRO's trade secrets not addressed in computing damages for actual loss;

(c)     That VoxTonePRO be awarded a reasonable royalty for Spotify's misappropriation of VoxTonePRO's trade secrets;

(d)     That VoxTonePRO be awarded punitive and exemplary damages for Spotify's willful and malicious misappropriation of VoxTonePRO's trade secrets;

(e)     That VoxTonePRO be awarded reasonable costs, including attorneys' fees and expenses;

(f)     That disgorgement of any profits Spotify has obtained, or will obtain, as a result of their improper use of VoxTonePRO's proprietary and confidential information shall be ordered;

(g)     That VoxTonePRO be awarded pre- and post-judgment interest; and

(h)     That VoxTonePRO be awarded such other equitable or legal relief as this Court deems just and proper under the circumstances.

Dated: April 30, 2020                    FISH & RICHARDSON P.C.

By: */s/ Susan E. Morrison*
    Susan E. Morrison (#4690)
    Kelly Allenspach Del Dotto (#5969)
    222 Delaware Avenue, 17th Floor
    Wilmington, DE 19801
    (302) 652-5070
    morrison@fr.com
    kad@fr.com

    Juanita R. Brooks
    Cheryl Wang
    Fish & Richardson P.C.
    12390 El Camino Real
    San Diego, CA 92130
    858-678-5070
    brooks@fr.com
    cwang@fr.com

    Lawrence K. Kolodney
    Kayleigh McGlynn
    Fish & Richardson P.C.
    1 Marina Park Drive
    Boston, MA 02210
    617-542-5070
    kolodney@fr.com
    mcglynn@fr.com

    Michael T. Zoppo
    Fish & Richardson P.C.
    7 Times Square, 20th Floor
    New York, NY 10036
    212-765-5070
    zoppo@fr.com

    Esha Bandyopadhyay
    Fish & Richardson P.C.
    500 Arguello Street, Suite 500
    Redwood City, CA  94063
    650-839-5070
    bandyopadhyay@fr.com

    Attorneys for Plaintiff
    Mujae Group, Inc. d/b/a VoxTonePRO